IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TOBACCO TECHNOLOGY, INC.

v.  :  Civil No. CCB-06-0563

TAIGA INTERNATIONAL N.V., *et al.*

# MEMORANDUM

Plaintiff, Tobacco Technology, Inc. ("TTI"), is suing in diversity defendants Taiga International N.V. ("Taiga"); a former board member of TTI and Taiga, Thomas Massetti; and the Managing Director of Taiga, Marie-Paul Voûte. TTI alleges various contract and tort claims. Currently before the court are defendants' motions to dismiss. The issues have been fully briefed and argued. For the following reasons, the defendants' motions will be denied.

# BACKGROUND FACTS

Plaintiff filed its complaint on March 3, 2006, alleging: (1) breaches of contract by Taiga; (2) breaches of agent's duty by Taiga; (3) breaches of director's duty by Massetti; (4) aiding and abetting Massetti's breaches of director's duty by Taiga and Voûte; and (5) misappropriation of trade secrets by Taiga and Voûte. Defendant Massetti independently filed a Rule 12(b)(6) motion to dismiss Count III. Taiga and Voûte also jointly filed a Rule 12(b)(6) motion to dismiss the remainder of the Complaint.

TTI, a Maryland corporation, is a manufacturer of tobacco flavors and products. Taiga, a Belgian corporation, was created in 1992 to serve as the exclusive European agent for TTI's tobacco flavors, the formulas for which are TTI trade secrets. Although TTI and Taiga are separate independent companies, they have been closely intertwined since Taiga's inception.

1

For example, Ronald Whitehead, TTI's president, sat on the board of directors for both Taiga and TTI at all times relevant to this complaint. (Compl. ¶ 2, 5.) Similarly, defendant Massetti has served as chairman of Taiga's board of directors since its creation, while also serving as a member of TTI's board of directors from 1993 to 2003. In addition, Whitehead and Massetti purchased shares in Taiga, as did family members of TTI's founder, Jeremy Cassels-Smith ("J. Cassels-Smith").

The contractual relationship between TTI and Taiga began as an exclusive agency agreement, whereby Taiga purchased tobacco flavors from TTI and then resold these flavors to certain pre-designated European customers. In exchange for TTI using Taiga as its sole European distributor, Taiga promised to buy tobacco flavorings exclusively from TTI, to refrain from manufacturing its own tobacco flavorings, and to sell tobacco flavors only in pre-designated territories. (Compl. ¶ 6, 43.)

In March 2000, J. Cassels-Smith, on behalf of TTI's board of directors, ratified a modification to the TTI-Taiga agency relationship, which allowed Taiga to manufacture and develop its own tobacco flavors while still maintaining the exclusive agency relationship between TTI and Taiga. (Compl. ¶ 7-9.) Prior to being ratified, this change was presented by Voûte to Massetti and Whitehead at a February 2000 Taiga board of directors meeting, where all three provisionally agreed to the modification. As part of the new arrangement, Taiga would purchase TTI flavor bases either to simply distribute or to use in Taiga's own flavor formulation. For those flavors used in Taiga's formulas, Taiga was to pay TTI a set commission based on "the amount Taiga invoiced to its customers." (Compl. ¶ 7-8, 39.) In its complaint, TTI alleges that the above "commission arrangement – designed to be far more profitable to Taiga, and far less

2

profitable to TTI, than the original relationship had been – presented both Massetti and Whitehead with conflicts of interest." (Compl. ¶ 8.) TTI represents that, at this point in time, its president, Ronald Whitehead, was acting against TTI's interests, rather "as Taiga's agent." (Compl. ¶ 9.)

Before Taiga had paid any commissions to TTI under the February 2000 agreement, Massetti, Whitehead and Voûte proposed yet another change in the summer of 2000. This second change directed that the commission payable to TTI for its flavor bases would be calculated according to the costs of the raw materials contained in Taiga's finished product, rather than the price paid by Taiga customers.[1] Although implemented by Taiga, the change was never formally presented to TTI, which allegedly first learned of the modification in a letter from Voûte dated April 11, 2005. (Compl. ¶ 12-13.)

Defendants instead actively tried to conceal the basis for Taiga's commission calculations by excluding from the commission statements any information on the prices paid by Taiga customers or the raw-material costs for Taiga's flavors. (Compl. ¶ 25.) In addition, Taiga changed the accounting method it used to report sales volume. (Compl. ¶ 29.) Further, in order to prevent TTI from learning of the commission calculations for two lucrative projects about to come to fruition, Voûte changed "the time of a Brussels meeting called to discuss the business expectancies of TTI and Taiga," which TTI's vice-president was scheduled to attend. (Compl. ¶ 26.)

---

[1] Due to the time it took Taiga to develop its own flavors, TTI did not receive its first commission payment until sometime in 2001, after the summer 2000 agreement had been implemented. Thus, TTI never received any commission statements based on customer invoices as per the terms of the February 2000 agreement.

## ANALYSIS

### I. Motion to Dismiss Standard

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and alterations omitted).  When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Edwards*, 178 F.3d at 244.  To survive a motion to dismiss, however, a complaint must "in light of the nature of the action . . . sufficiently allege[] each element of the cause of action so as to inform the opposing party of the claim and its general basis."  *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005).  In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions.  *See, e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (noting that the "presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions).

### II.  Statute of Limitations

In this diversity jurisdiction case, Maryland law applies.  *See, e.g.*, *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771 (4th Cir. 1995).  As a preliminary matter, defendants assert

4

TTI's claims must be dismissed as time-barred under Maryland's three-year statute of limitations for civil actions. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101 (2006). Pursuant to Maryland's discovery rule, the three-year statute of limitations will begin to run when a plaintiff "in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 431 A.2d 677, 679-80 (Md. 1981). In addition, however, Maryland recognizes the "continuation of events" doctrine, whereby a continuous relationship between the parties will toll the statute of limitations until the relationship ends, unless the plaintiff sooner knew or reasonably should have known of the injury or harm. *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 974 (Md. 2000). This doctrine is premised on the reasoning that:

> [A] confidential relationship, by its nature, gives the confiding party the right to relax his or her vigilance to a certain extent and rely on both the good faith of the other party and that party's duty to disclose all material facts and, as a result, the confiding party has no duty to make inquiries until something occurs to make him or her suspicious.

*Id*. at 975-76; *see also Merchants Mortgage Co. v. Lubow*, 339 A.2d 664, 669 (Md. 1975) (relaxing the ordinary diligence requirement imposed on plaintiff corporation with regard to its officer and director).

Because TTI had an ongoing relationship with the defendants, TTI argues the statute of limitations was tolled for Count I-II and IV-V until Taiga terminated its agency relationship on June 9, 2005, and for Count III, until Massetti's fiduciary relationship with TTI ended on March 10, 2003. The "continuation of events" theory may not apply, however, if Taiga or Massetti can show that TTI had actual or inquiry notice of its claims before those dates. *See Frederick*, 756 A.2d at 976.

### A. Imputed Knowledge

5

Defendants first assert that TTI's claims are time-barred based on the imputed knowledge of TTI's president, Ronald Whitehead. Maryland follows traditional rules of agency law, such that "notice to an officer or agent is notice to the corporation 'where the officer or agent in the line of his duty 'ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation.'" *Hecht v. Resolution Trust Corp.*, 635 A.2d 394, 405 (Md. 1994). This rule is premised on the legal fiction that an agent acting in the scope of the agency relationship shares an identity of interest with his principal such that the law presumes the agent will communicate to the principal any knowledge gained in the course of the agency relationship. *Martin Marietta*, 70 F.3d at 773.

The legal fiction breaks down, however, when an agent's interests are "completely adverse" to those of his principal, an exception to the general rule of imputation recognized in Maryland. *Id.* at 771-73. For this adverse-interest exception to apply, "the agent must have totally abandoned the principal's interest and be acting for his own purposes or those of another," such that it is reasonably probable the agent will conceal his knowledge from the principal. *Id.* at 773. Three questions are pertinent to this inquiry: (1) whether the knowledge sought to be imputed to the principal was acquired by the agent outside the scope of his agency relationship; (2) with respect to which transaction is the knowledge sought to be imputed; and (3) as to that transaction, are the interests of the principal and agent sufficiently adverse that it is reasonable to infer the agent will conceal his knowledge from the principal. *See id.* at 773-74.

In the present case, defendants seek to impute to TTI the knowledge Whitehead acquired at the summer 2000 Taiga board of directors meeting, at which Whitehead, Massetti and Voûte agreed that the commission payable to TTI for its flavor bases would no longer be calculated

6

according to the price paid by Taiga customers, but rather would be based on the cost of raw materials contained in Taiga's finished products. (Compl. ¶ 12.) The parties dispute, however, whether Whitehead attended the summer 2000 meeting in his capacity as TTI's president, Taiga's board member, or both.

While dual agency alone does not prevent an agent's knowledge from being imputed to the principal "where there is good faith, no conflict of interest, and due authority from both principals," this is not the case alleged here. *See Mercy Med. Ctr., Inc. v. United Healthcare, Inc.*, 815 A.2d 886, 904-05 (Md. Ct. Spec. App. 2003); *see also Martin Marietta*, 70 F.3d at 773. The complaint specifically alleges that Whitehead was presented with a classic conflict of interest and concludes that Whitehead was acting as Taiga's agent, against TTI's interests, when he orally relayed the February 2000 modification to TTI, and, by inference, when he agreed to the second summer 2000 amendment as well. (Compl. ¶ 9-14.) Considering all the circumstances, this is sufficient to call into question the legally presumed "identity of interest" between Whitehead and TTI. *See Martin Marietta*, 70 F.3d at 773. Thus, the knowledge defendants seek to impute to TTI about the 2000 summer agreement was not necessarily acquired by Whitehead within the scope of his agency relationship with TTI.

Because Whitehead's presence at the summer 2000 meeting cannot be completely divorced from his role as TTI's president, however, it is necessary to consider the final prong articulated in *Martin Marietta*: whether Whitehead's interests were sufficiently adverse to those of TTI so "as practically to destroy the agency or render it reasonably probable that an ordinary person . . . will withhold such knowledge from the principal." 70 F.3d at 773; *see also Mercy*, 815 A.2d at 904; *Lohmuller Bldg. Co. v. Gamble*, 154 A. 41, 44 (Md. 1931). TTI alleges that the

summer 2000 agreement promised to drastically reduce TTI's "already diminished profits," presenting both Whitehead and Massetti with "classic conflicts of interest." (Compl. ¶ 12, 14.) Thus, this second proposal, plaintiff argues, was so obviously and extremely detrimental to TTI that its board of directors could not reasonably have been expected to approve it. (Compl. ¶ 12.) Moreover, there is no evidence that the summer 2000 modification conferred any benefit on TTI. *See Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (explaining that for the adverse-interest exception to apply under Florida law, an agent's "actions must neither be intended to benefit the corporation nor actually cause short- or long-term benefit to the corporation"). Instead, the complaint alleges Whitehead was acting as Taiga's agent, against TTI's interests. *See Martin Marietta*, 70 F.3d at 773; Restatement (Third) of Agency § 5.04 (2006) (precluding imputation when an agent intends "to act solely for the agent's own purposes or those of another person").

Based on the fact that TTI reluctantly ratified the first proposal, one could reasonably infer that Whitehead would not present an even more obviously detrimental modification just a few months later. As the Maryland Court of Appeals has observed, "[i]t is unlikely that directors will take the affirmative step of communicating information that could raise criticism of their performance." *Hecht*, 635 A.2d at 408. Furthermore, Whitehead had no choice but to report the February 2000 modification as it noticeably altered an integral part of the agency agreement between TTI and Taiga. Having alerted TTI of the commission statements the company would be receiving from Taiga, however, Whitehead could conceal the summer 2000 modification without fear of detection, as no commissions had been paid under the February 2000 agreement and the summer 2000 modification merely altered the basis on which the commissions were calculated.

Therefore, while it is a close question, the conflict of interest Whitehead confronted in his role as a dual agent combined with the deleterious consequences TTI allegedly suffered from the secret summer 2000 modification states sufficient adversity of interest to survive a motion to dismiss.

### B. Inquiry Notice

Even if Whitehead's knowledge cannot be imputed to TTI, defendants assert TTI was placed on inquiry notice of its claims as early as 2000. A plaintiff is put on inquiry notice, and the statute of limitations begins to run, when he has "'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].'" *Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796, 802 (2000) (citing *Pennwalt Corp. v. Nasios*, 550 A.2d 1155, 1163 (1988)).

Plaintiff contends, however, that Taiga, Voûte and Massetti actively tried to conceal their wrongdoings. Furthermore, given the agency relationship TTI enjoyed with defendants, TTI asserts it was entitled to rely on defendants' good faith and duty to disclose absent something triggering TTI's suspicion. *See Frederick*, 756 A.2d at 975-76. While a party is required to use due diligence in detecting a fraud, the Maryland Court of Appeals has noted:

> [W]hether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury.

*Frederick*, 756 A.2d at 974.

TTI alleges it did not learn of the summer 2000 change until August 2005 in a letter from Voûte. (Compl. ¶ 13.) Defendants, on the other hand, argue that if the interests of Whitehead, Massetti and Taiga were so adverse to TTI as to prevent imputation and destroy agency, TTI

9

should have been on inquiry notice of its claims long before Voûte's letter.  Yet defendants actively concealed from TTI the facts forming the basis of plaintiff's complaint.  For example, Taiga excluded from its commission statements any information on the prices paid by Taiga customers or the raw-material costs for Taiga's flavors, either of which might have alerted TTI that something was amiss.  (Compl. ¶ 25.)  In addition, Taiga changed its accounting method of reporting sales and misstated the amount of TTI flavor bases contained in Taiga's final products "so as to avoid or understate the commission actually due to TTI."  (Compl. ¶ 40.)

Moreover, when G. Cassels-Smith confronted Voûte about various possible breaches of contract by Taiga, Voûte repeatedly and falsely "denied any knowledge of the matter."  (Compl. ¶ 30.)  Similarly, Massetti concealed the summer 2000 modification with TTI even after his relationship with the company had ended, faxing as "proof" of the terms of the summer 2000 agreement a commission schedule with no reference to raw material cost.[2]  (Compl. ¶ 10-11, Ex. B, C.)  Further, in order to prevent TTI from learning of the commission calculations for two lucrative projects about to come to fruition, Voûte changed "the time of a Brussels meeting called to discuss the business expectancies of TTI and Taiga," which G. Cassels-Smith, TTI's vice-president, was scheduled to attend.  (Compl. ¶ 26.)

Nevertheless, defendants argue that TTI had reason to be suspicious of Taiga, given that TTI had only hesitantly ratified the February 2000 proposal and faced a potentially drastic decrease in profits as a consequence of the summer 2000 agreement.  TTI, however, did not

---

[2]  Massetti's faxed document (Compl. Ex. B) is almost identical to a document received from Taiga's counsel in August 2005 (Compl. Ex. C), both of which outline the terms of the summer 2000 amendment, but only the latter contains an added notation that commissions are to be paid on raw material cost.

receive any commission statements from Taiga until approximately a year after ratifying the February 2000 change. Thus, the February 2000 agreement was never fully implemented, as Taiga's commission payments have always been based on raw material cost as specified in the summer 2000 modification. Lacking a basis on which to compare its revenue, TTI could not reasonably have been expected to detect its loss in potential commission as early as the defendants suggest. Therefore, whether TTI failed to use due diligence to discover defendants' unlawful actions or defendants so concealed them as to prevent discovery cannot be decided as a matter of law and defeats defendants' motion to dismiss on this point.

### III.  Omnibus Tort

Even if plaintiff's claims are not time-barred, defendants assert Counts II-IV should nevertheless be dismissed on the grounds that Maryland does not recognize a cause of action for breach of fiduciary duty.[3] *Hartlove v. Maryland Sch. for the Blind*, 681 A.2d 584, 593 (Md. App. 1996), first recognized the possibility of a claim at law in Maryland for breach of fiduciary duty. The Maryland Court of Appeals, partially disapproving *Hartlove*, subsequently explained in *Kann v. Kann*, 690 A.2d 509, 511 (Md. 1997), however, that "allegations of breach of fiduciary duty, in and of themselves, do not give rise to an omnibus or generic cause of action at law that is assertable against all fiduciaries." *Kann* involved a claim against a trustee for breach

---

[3] Defendants also argue Count IV (aiding and abetting) should be dismissed as duplicative of TTI's underlying claims. The Complaint, however, alleges Taiga and Voûte breached their general duty not to assist Massetti in breaching his director's duty to TTI, which are two separate and distinct breaches of duty. Neither of the cases cited by defendants are on point. Maryland law imposes aider and abettor tort liability. *See Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 655 A.2d 1038, 1049-50 (Md. 1995). Thus, if breach of director's duty is a valid underlying tort, defendants' argument is without merit. *See id.* (citing *Holmes v. Young*, 885 P.2d 305 (Col. App. 1994), for recognizing aiding and abetting breach of fiduciary duty as a valid cause of action).

of trust, which the court reasoned is "exclusively equitable" in holding therefore that the right to a jury does not attach. *Id*. The court further explained, however, that:

> This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem. Whether the cause or causes of action selected carry the right to a jury trial will have to be determined by an historical analysis.

*Id.* at 521.

Subsequent Maryland courts confronting the issue, arguably including this court, have varied in their interpretation of *Kann*. *See Swedish Civil Aviation v. Project Mgmt. Enter., Inc.*, 190 F. Supp. 2d 785, 801 (D. Md. 2002); *BEP, Inc. v. Atkinson*, 174 F. Supp. 2d 400, 405 (D. Md. 2001); *Kerby v. Mortgage Funding Corp.*, 991 F. Supp. 787, 803 (D. Md. 1998); *Int'l Bhd. of Teamsters v. Willis Corroon Corp.*, 802 A.2d 1050, 1051 n.1 (Md. 2002); *Insurance Co. v. Miller*, 765 A.2d 587, 596-601 (Md. 2001); *Vinogradova v. Suntrust Bank, Inc.*, 875 A.2d 222, 230-31 (Md. App. 2004). Overall, however, case law supports the conclusion that while Maryland does not recognize a universal or omnibus tort for the redress of breach of fiduciary duty, breach of an agent's duty owed to his principal does provide a claim for breach of fiduciary duty in some form. *See, e.g.*, *Miller*, 765 A.2d at 596-601; *BEP*, 174 F. Supp. 2d at 405; *cf.* 17 Maryland Law Encyclopedia Partnership § 53 (citing *Vinogradova*, 875 A.2d at 230-31, for the proposition that "Maryland does not recognize an independent or separate tort cause of action for breach of fiduciary duty, and instead treats breach of fiduciary duty as a claim for the tort of negligence").

At this stage, TTI has sufficiently alleged breaches of agent's duty by Massetti and Taiga,

which Maryland specifically recognized as a valid cause of action in *Miller*. *See* 765 A.2d at 596-97.

### IV. CONCLUSION

In sum, taking all facts plaintiff alleges as true and making all rational inferences in plaintiff's favor, TTI did not have actual or inquiry notice of its claims outside Maryland's three-year statute of limitations period. Therefore, plaintiff's complaint is not time-barred. In addition, because Maryland explicitly recognized breach of agent's duty as a valid claim in *Miller*, both pursuant to *Kann* and as part of a negligence cause of action, Counts II-IV will not be dismissed. *See* 765 A.2d at 601. Thus, defendants' motions to dismiss will be denied in full.

A separate order follows.


February 26, 2007                                  /s/
        Date                                 Catherine C. Blake
                                             United States District Judge